# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00023-CV

## In the Matter of J. J.

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
## NO. J-21,167, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING

## O P I N I O N

In March 2005, the district court, sitting as a juvenile court, adjudicated J.J. delinquent, assessed a determinate sentence of twenty years, and placed him in the custody of the Texas Youth Commission (TYC). In November 2007, the juvenile court ordered that J.J., now nineteen years old, serve the remainder of his sentence in the custody of the Institutional Division of the Texas Department of Criminal Justice (TDCJ). In two issues on appeal, J.J. contends that 2007 amendments to the human resources code barred his transfer to TDCJ after he turned nineteen and that, even if the juvenile court had authority to transfer him, it abused its discretion in doing so. We will affirm the juvenile court's order.

## BACKGROUND

J.J. was born on April 8, 1988. In November 2004, the State filed its third amended petition alleging delinquent conduct. In the petition, the State alleged that, on October 10 and 11, 2004, J.J. committed the offenses of aggravated assault with a deadly weapon and aggravated robbery with a deadly weapon, specifically a firearm. J.J. pleaded true to committing the offenses

alleged in the petition. The juvenile court found that J.J. had engaged in delinquent conduct, imposed a determinate sentence of twenty years,[1] and ordered that J.J. be committed to the care, custody, and control of TYC.

In September 2007, the Acting Executive Director of TYC recommended to the juvenile court that J.J. be transferred to TDCJ pursuant to section 61.079(a) of the human resources code.[2] The juvenile court set a transfer hearing for November 8, 2007.

Prior to the hearing, J.J. filed a "plea to the jurisdiction." In the plea, J.J., who had turned nineteen in April 2007, argued that section 61.079(a) of the human resources code, as it had been amended effective June 8, 2007, "only authorizes TYC to refer youth to the juvenile court for transfer hearings to TDCJ after the youth becomes 16 years of age but before the youth's 19th birthday." *See* Tex. Hum. Res. Code Ann. § 61.079(a) (West Supp. 2008). As J.J. observed, "TYC failed to refer him to the Court for approval of a transfer to TDCJ prior to his 19th birthday." J.J. further reasoned that "the juvenile court which committed a youth to TYC no longer has any role in determining whether the youth should be released from TYC and incarcerated in TDCJ after his or her 19th birthday."

---

[1] A determinate sentence is one in which the term of commitment begins in the custody of TYC with a possible transfer to TDCJ. *See* Tex. Fam. Code Ann. § 54.04(d)(3) (providing for determinate sentencing) (West Supp. 2008); *see also* Tex. Fam. Code Ann. § 53.045(a) (listing certain offenses for which determinate sentence may be assessed). A determinate sentence is usually reserved for violent or habitual juvenile offenders. *See* Robert Dawson, *Texas Juvenile Law* 421-25 (6th ed. 2004) (explaining history and scope of determinate-sentencing system).

[2] We note that this was not the first time that TYC recommended J.J.'s transfer to TDCJ. The record reflects that, on May 11, 2006, when J.J. was eighteen, TYC referred J.J. to the juvenile court for a transfer hearing, but, on June 14, 2006, TYC withdrew its request.

In response, the State argued that the juvenile court's jurisdiction over J.J. was governed not by section 61.079 of the human resources code, but by section 51.0411 of the family code. Section 51.0411 of the family code provides that the juvenile court "retains jurisdiction over a person, without regard to the age of the person, who is referred to the court under Section 54.11 for transfer to the Texas Department of Criminal Justice or release under supervision." Tex. Fam. Code Ann. § 51.0411 (West 2002). The State also argued that the amended version of section 61.079 of the human resources code did not govern J.J.'s transfer. The version of the statute that should apply, according to the State, was the version in effect at the time J.J. was adjudicated delinquent in 2005. That version of the statute gave TYC authority to refer a child to the juvenile court for transfer to TDCJ before the child becomes 21 years of age.[3]

The juvenile court denied the plea to the jurisdiction. Then, after hearing evidence, the juvenile court transferred J.J. to TDCJ to serve the remainder of his twenty-year sentence. This appeal followed.

## ANALYSIS

**Statutory authority to transfer J.J. to TDCJ**

We first address J.J.'s second issue, in which he contends that the juvenile court abused its discretion in transferring J.J. to TDCJ because it lacked statutory authority or jurisdiction to transfer him after he turned nineteen.[4] In support of this contention, J.J. relies on

---

[3] *See* Act of May 27, 1995, 74th Leg., R.S., ch. 262, § 61, 1995 Tex. Gen. Laws 2517, 2572 (amended 2007) (current version at Tex. Hum. Res. Code Ann. § 61.079(a) (West Supp. 2008)).

[4] The State attempts to distinguish between J.J.'s arguments below challenging the juvenile court's "jurisdiction" and his arguments on appeal, which are phrased in terms of the juvenile

sections 61.079(a) and 61.084(g) of the human resources code, as amended in 2007 by Senate Bill

103.[5]  As amended, section 61.079(a) provides, in relevant part:

> After a child sentenced to commitment under Section 54.04(d)(3), 54.04(m), or 54.05(f), Family Code, becomes 16 years of age *but before the child becomes 19 years of age*, the commission may refer the child to the juvenile court that entered the order of commitment for approval of the child's transfer to the Texas Department of Criminal Justice for confinement . . . .

Tex. Hum. Res. Code Ann. § 61.079(a) (emphasis added).  The amended version of

section 61.084(g) provides:

> The commission shall transfer a person who has been sentenced under a determinate sentence to commitment under Section 54.04(d)(3), 54.04(m), or 54.05(f), Family Code, or who has been returned to the commission under Section 54.11(i)(1), Family Code, to the custody of the Texas Department of Criminal Justice *on the person's 19th birthday*, if the person has not already been discharged or transferred, to serve the remainder of the person's sentence on parole as provided by Section 508.156, Government Code.

*Id*. § 61.084(g) (West Supp. 2008) (emphasis added).

Under the amended versions of these statutes, according to J.J., TYC lost the

authority to refer him to the juvenile court for transfer to TDCJ after he turned nineteen, which in

court's "authority" and whether it "abused its discretion" in exceeding that authority.  Relying on this purported distinction, the State argues that J.J. has failed to brief his contentions regarding the juvenile court's "jurisdiction" on appeal.  We disagree.  Whether styled in terms of a lack of "jurisdiction," lack of "authority," or abuse of discretion, J.J.'s central contention both here and below has been that the 2007 amendments to the human resources code precluded his transfer to TDCJ because he was age 19 at the time of the transfer order.  J.J. has preserved this contention on appeal.

[5]  *See* Act of May 25, 2007, 80th Leg., R.S., ch. 263, 2007 Tex. Gen. Laws 421 (effective June 8, 2007).

4

turn divested the juvenile court of authority to act on such a referral. J.J. further asserts that once he turned nineteen, the amended version of section 61.084(g) required TYC to transfer him to the custody of TDCJ to serve the remainder of his sentence on parole.

The State maintains that the amended versions of these statutes do not apply to J.J.'s transfer. Instead, the State contends, the versions of the statutes in effect when J.J. was adjudicated delinquent in 2005 govern. Under these versions of the statutes, TYC could refer a person for transfer to TDCJ no later than the person's 21st birthday.[6]

Although we review the juvenile court's decision to transfer a juvenile from TYC to TDCJ for abuse of discretion, *In re F.D.*, 245 S.W.3d 110, 113 (Tex. App.—Dallas 2008, no pet.), our resolution of J.J.'s specific contentions here turn on questions of statutory construction, which present questions of law that we review de novo. *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631 (Tex. 2008). Our primary objective in statutory construction is to give effect to the legislature's intent. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). We rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results that the legislature could not have intended. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008); *see* Tex. Gov't Code Ann. § 311.011 (West 2005) ("[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage"). We must consider the statute as a whole

---

[6] *See* Act of May 27, 1995, 74th Leg., R.S., ch. 262, § 61, 1995 Tex. Gen. Laws 2517, 2572, 2573-74 (current versions at Tex. Hum. Res. Code Ann. §§ 61.079(a), 61.084(g) (West Supp. 2008)).

5

and in context, and not merely consider provisions in isolation. *Texas Dept. of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004).

We first observe that the legislature has given the juvenile court "exclusive original jurisdiction over proceedings under this title [the juvenile justice code]." Tex. Fam. Code Ann. § 51.04(a) (West 2002). This jurisdiction extends to proceedings "in all cases involving the delinquent conduct or conduct indicating a need for supervision engaged in by a person who was a child within the meaning of this title at the time the person engaged in the conduct." *Id.* These proceedings include hearings to release a juvenile under the supervision of TYC or to transfer a juvenile to TDCJ. *See id.* § 54.11(a) (West Supp. 2008).[7] Furthermore, the legislature has provided that "[t]he court retains jurisdiction over a person, *without regard to the age of the person*, who is referred to the court under Section 54.11 for transfer to the Texas Department of Criminal Justice or release under supervision." *Id.* § 51.0411 (West 2002) (emphasis added).

The legislature did not amend or alter any of these provisions when it amended the human resources code. By the express terms of these provisions, the juvenile court retained

---

[7] Section 54.11(a) provides,

> On receipt of a referral under Section 61.079(a), Human Resources Code, for the transfer to the institutional division of the Texas Department of Criminal Justice of a person committed to the Texas Youth Commission under Section 54.04(d)(3), 54.04(m), or 54.05(f), or on receipt of a request by the commission under Section 61.081(g), Human Resources Code, for approval of the release under supervision of a person committed to the commission under Section 54.04(d)(3), 54.04(m), or 54.05(f), the court shall set a time and place for a hearing on the release of the person.

Tex. Fam. Code Ann. § 54.11(a) (West Supp. 2008).

6

jurisdiction to transfer J.J. to TDCJ after he turned nineteen. J.J.'s arguments regarding the 2007 amendments to the human resources code instead potentially implicate whether TYC retained authority, after J.J. turned nineteen, to refer him to the juvenile court for transfer to TDCJ. The answer depends on whether the amended versions of sections 61.079(a) and 61.084(g), which took effect after J.J. was adjudicated delinquent but prior to TYC's referral of J.J. to the juvenile court for a transfer hearing, govern his referral. In a memorandum opinion decided earlier this year, this Court concluded that the amended statutes do not apply retrospectively to persons who had been adjudicated delinquent as juveniles under the prior law. *See In re T.G.*, No. 03-07-00543-CV, 2008 Tex. App. LEXIS 4551, at *21 (Tex. App.—Austin June 19, 2008, pet. denied) (mem. op.) ("We conclude that the legislature intended for the amendments to human resources code sections 61.079 and 61.084 to operate only prospectively."). J.J. acknowledges this opinion, but asks that we "review" or reconsider it. We conclude that *T.G.* was correctly decided, and will follow it here.

"A statute is presumed to be prospective in its operation unless expressly made retrospective." Tex. Gov't Code Ann. § 311.022 (West 2005); *see also* Tex. Const. art. I, § 16 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."). "Statutes are only applied retroactively if the statutory language indicates that the Legislature intended that the statute be retroactive." *In re M.C.C.*, 187 S.W.3d 383, 384 (Tex. 2006). Senate Bill 103 contained language indicating that the legislature may have intended retrospective application in certain cases involving juveniles who had committed misdemeanors:

A person committed to the Texas Youth Commission on the basis of conduct constituting the commission of an offense of the grade of misdemeanor under Subdivision (2), Subsection (d), Section 54.04, Family Code, *as it existed before the effective date of this Act*, must be discharged from the custody of the Texas Youth Commission not later than the person's 19th birthday.

Act of May 25, 2007, 80th Leg., R.S., ch. 263, § 65, 2007 Tex. Gen. Laws 421, 455 (emphasis added). However, there is no language in Senate Bill 103 indicating that the legislature intended the amended versions of sections 61.079(a) and 61.084(g) to apply retroactively in cases involving felony offenses. As this Court observed in *T.G.*, the above provision demonstrates "[t]hat the legislature knew how to make a provision retrospective," *In re T.G.*, 2008 Tex. App. LEXIS 4551, at *20, implying that it did not intend similar retrospective application to juveniles who had committed felonies:

It is equally clear that the legislature sought only to effect an immediate discharge from the TYC for those persons who had committed a misdemeanor. It necessarily follows that the legislature did not intend to discharge or release to parole a person . . . who had committed a felony and had received a determinate sentence.

*Id*.

J.J. received a determinate sentence for committing aggravated assault with a deadly weapon and aggravated robbery with a deadly weapon, both felony offenses. J.J. was sentenced prior to the effective date of the 2007 amendments to sections 61.079(a) and 61.084(g) of the human resources code. Absent express language indicating that the legislature intended retrospective application, we must presume that the amended versions of sections 61.079(a) and 61.084(g) do not apply here. *See In re M.C.C.*, 187 S.W.3d at 384.

8

J.J. attributes significance to the fact that there is no specific savings clause in Senate Bill 103 involving the statutory amendments at issue in this case. Observing that the legislature included a specific savings clause for certain other portions of the 2007 amendments,[8] J.J. suggests that by omitting a similar savings clause for sections 61.079(a) and 61.084(g), the legislature evidenced its intent to discontinue the former versions of those statutes as soon as the amended versions became effective. We disagree. Instead, the general savings clause of the Code Construction Act governs:

> (a) Except as provided by Subsection (b),[9] the reenactment, revision, amendment, or repeal of a statute does not affect:
>
>> (1) the prior operation of the statute or any prior action taken under it;
>>
>> (2) any validation, cure, right, privilege, obligation, or liability previously acquired, accrued, accorded, or incurred under it;

---

[8] For example, section 67 provides:

> The change in law made by Section 54.052, Family Code, as added by this Act, and Subsection (c), Section 61.0841, Human Resources Code, as added by this Act, applies only to conduct for which a child is adjudicated on or after the effective date of this Act. *A child who is adjudicated before the effective date of this Act is governed by the law in effect when the child was adjudicated, and the former law is continued in effect for that purpose.*

Act of May 25, 2007, 80th Leg., R.S., ch. 263, § 67, 2007 Tex. Gen. Laws 421, 455 (emphasis added).

[9] Subsection (b) provides, "If the penalty, forfeiture, or punishment for any offense is reduced by a reenactment, revision, or amendment of a statute, the penalty, forfeiture, or punishment, if not already imposed, shall be imposed according to the statute as amended." Tex. Gov't Code Ann. § 311.031(a) (West 2005). As there was no reduction in "penalty, forfeiture, or punishment" in this case, this subsection does not apply.

(3) any violation of the statute or any penalty, forfeiture, or punishment incurred under the statute before its amendment or repeal; or

(4) any investigation, proceeding, or remedy concerning any privilege, obligation, liability, penalty, forfeiture, or punishment; and the investigation, proceeding, or remedy may be instituted, continued, or enforced, and the penalty, forfeiture, or punishment imposed, as if the statute had not been repealed or amended.

Tex. Gov't Code Ann. § 311.031(a) (West 2005) (emphasis added). We are "to presume that the general savings clause applies unless a contrary legislative intent is shown by clear expression or necessary implication." *Quick v. City of Austin*, 7 S.W.3d 109, 130 (Tex. 1999). Finding no contrary legislative intent, we conclude that the general savings clause applies in this case. Specifically, subsection (a)(4) applies, as the hearing to transfer J.J. to TDCJ was a proceeding concerning his punishment for the felony offenses he had previously committed and for which he had been adjudicated delinquent prior to the effective date of Senate Bill 103.

We conclude that the versions of sections 61.079(a) and 61.084(g) of the human resources code in effect at the time J.J. was adjudicated delinquent in 2005 govern TYC's referral of him to the juvenile court for possible transfer. Consequently, TYC retained the authority to refer J.J. to the juvenile court for transfer to TDCJ after he turned nineteen. We overrule J.J.'s second issue.

**Merits of the transfer order**

We now address J.J.'s first issue, in which he challenges the merits of the juvenile court's decision to transfer him to TDCJ. According to J.J., he should not have been transferred to TDCJ because he was "advancing in all phases of the [TYC] resocialization program."

10

Once TYC refers a person to the juvenile court for a transfer, the juvenile court is required to hold a hearing to determine whether to transfer the person to the custody of TDCJ for the completion of the person's sentence. *See* Tex. Fam. Code Ann. § 54.11(a), (i) (West Supp. 2008). In making this determination, the juvenile court may consider a number of factors, including:

(i)      the experiences and character of the person before and after commitment to the youth commission;

(ii)     the nature of the penal offense that the person was found to have committed and the manner in which the offense was committed;

(iii)    the abilities of the person to contribute to society;

(iv)    the protection of the victim of the offense or any member of the victim's family;

(v)     the recommendations of the youth commission and prosecuting attorney;

(vi)    the best interests of the person; and

(vii)   any other factor relevant to the issue to be decided.

*Id*. § 54.11(k). The juvenile court is not required to consider all of the factors, and the court is expressly allowed to consider unlisted but relevant factors. *In re C.L.*, 874 S.W.2d 880, 886 (Tex. App.—Austin 1994, no writ). Evidence of each listed factor is not required. *Id*. Similarly, the juvenile court may assign different weights to the factors it considers. *Id*.

We review the juvenile court's decision to transfer a juvenile from TYC to TDCJ for abuse of discretion. *In re F.D.*, 245 S.W.3d at 113; *In re C.L.*, 874 S.W.2d at 886. In deciding whether the juvenile court abused its discretion, we review the entire record to determine if the court acted without reference to any guiding rules or principles. *In re J.L.C.*, 160 S.W.3d 312,

11

313 (Tex. App.—Dallas 2005, no pet.).  If "some evidence" exists to support the juvenile court's decision, there is no abuse of discretion.  *In re F.D.*, 245 S.W.3d at 113; *In re D.L.*, 198 S.W.3d 228, 229 (Tex. App.—San Antonio 2006, pet. denied); *In re R.G.*, 994 S.W.2d 309, 312 (Tex. App.—Houston [1st Dist.] 1999, pet. denied).

At the transfer hearing, the juvenile court considered testimony from several witnesses. Emir Perez, J.J.'s probation officer, testified briefly about J.J.'s criminal history.  Perez testified that, in addition to the offenses for which J.J. had been adjudicated delinquent, J.J. had also been accused of committing the offenses of criminal trespass in 2001 and failing to attend school in 2003 and 2004.  Perez further testified that "there was a referral in December of 2004 for aggravated assault with a deadly weapon."  According to Perez, J.J. was alleged to have used a kitchen knife in the December 2004 assault, and, on the offenses for which J.J. had received his determinate sentence, J.J. was alleged to have used a .32 caliber revolver and a knife.

Leonard Cucolo, TYC's court liaison, summarized for the juvenile court J.J.'s behavior and progress while J.J. was in the custody of TYC.  Cucolo testified as follows:

> Well, Jimmy has been with us for 31 months.  During that time, he's engaged in 85 documented incidents of misconduct.  Eight of those are self-referrals and are not considered incidents of misconduct and are actually good things.
>
> He was placed in the security unit on 19 occasions.  His last placement occurred in September of this year for danger to others.  Overall, his behavior has been inconsistent to poor.  That's how I described it.
>
> More importantly, his behavior has reflected some very serious assaults.  Actually two new felony offenses that were committed while confined in the Texas Youth Commission.  One in November of '05, and one recently over where the youth was assaulted in July of this year.

12

Both victims sustained injuries and required hospitalization. So there's serious assaultive behavior problems that he's engaged in.

Cucolo explained that J.J. had engaged in four incidents that were characterized as Category 1 violations, which were considered to be the most serious. Two of those incidents were the assaults mentioned above. In the November 2005 assault, J.J. punched a corrections officer in the face, injuring his eye. In the July 2007 assault, J.J. hit a youth "several times in the facial area." Cucolo testified that J.J. knocked the youth to the ground and rendered him unconscious. The other two Category 1 violations were an "assault by threat and a bodily injury" in September 2005, and "tampering with technology and safety equipment" in August 2006.

Cucolo added that J.J. "has done well on occasion" and that he has been able to maintain good behavior for "a period of time." However, according to Cucolo, J.J. has "never been able to sustain it." Cucolo further testified that J.J. did "very well" academically and completed TYC's "Building Trades Program," "Independent Living Project," and "Project Rio," a program designed to prepare juveniles for interviewing and getting a job. Nevertheless, Cucolo explained, TYC was recommending that J.J. be transferred to TDCJ because of the "very serious assaultive behavior" that J.J. had engaged in as recently as July of that year.

Dr. Nancy Razo, TYC's Director of Clinical Services at the facility where J.J. had been in custody, evaluated J.J. for transfer to TDCJ. Dr. Razo testified that, during her interview with J.J., he minimized his responsibility for the offenses for which he had been adjudicated delinquent and "took no responsibility for his behavior." Razo also disputed whether J.J. had made progress in TYC's resocialization program. In fact, Razo testified that she believed there

13

were times during J.J.'s stay in the facility when, as a result of his behavior, J.J. should have been demoted to lower "correctional phases," but he was not.[10]

Dr. Razo agreed with TYC's recommendation that J.J. be transferred to TDCJ. Razo admitted that one of the reasons she recommended the transfer was because the effects of Senate Bill 103 were still uncertain, and TYC was "under the impression" that offenders who had turned nineteen needed to be released or transferred. However, Razo added that she probably would have recommended J.J.'s transfer even if Senate Bill 103 had not been an issue. Razo testified that her recommendation was based on her concerns that the assault J.J. had committed in July was violent, that it occurred when J.J. was already aware that he was facing transfer, and that J.J. did not take responsibility for committing the offenses that had resulted in his adjudication. Razo was also concerned that J.J. was, in her words, "covert," meaning that he could commit a violent offense "all of a sudden" and with "no warning." When asked if there were any additional services that could be offered to J.J. if he was returned to the custody of TYC, Razo testified, "There's really nothing different that could be offered. . . . [W]e really exhausted all possibilities. . . ."

---

[10] "Correctional phases" measure a juvenile's progress in TYC's correctional programs. When juveniles begin at TYC, they start at phase C-0. C-4 is the highest phase a juvenile can obtain. Dr. Razo testified that, when she evaluated J.J., he was listed at a C-4 even though, according to Razo, his behavior and failure to accept personal responsibility for his actions merited a C-3 or C-2. Razo testified that C-2 is the lowest phase to which a juvenile can be demoted.

There are also "academic phases" and "behavioral phases" that operate in a similar manner. The record reflects that, at the time of the transfer hearing, J.J. had attained an A-4, the highest academic level. As for his behavioral level, in the year before he was transferred, J.J. had fluctuated between a B-3 and a B-4. At the time of the transfer hearing, he was at a B-3.

Cary Grant, J.J.'s case manager, testified that when he talked to J.J. about the July 2007 assault, J.J. told him that he was acting in self-defense and that the other youth hit him first. However, Grant added, J.J.'s explanation of the assault contradicted the written report of the incident. Also, Grant testified, J.J. had difficulty accepting responsibility for the full extent of the injuries sustained by the youth that he had assaulted. Grant recounted, "[H]e felt that most of the injury had been caused when the kid's head hit the cement. Because I had to explain to him you knocked him unconscious, anything that happened to the kid after that was also your responsibility. That part he didn't grasp." On cross-examination, Grant testified that J.J. was no longer "defiant," that he had been making an "effort" to "work the program," and that he was no longer a disruption to the program.

To summarize, while there was evidence that J.J. was making some progress in TYC's resocialization program, this evidence was disputed by Dr. Razo. On the other hand, it was undisputed that J.J. engaged in violent, assaultive behavior on multiple occasions both before and after he was committed to TYC, including a serious incident in July 2007—less than five months before J.J.'s transfer hearing—that rendered a youth unconscious. Furthermore, there was evidence that the offenses for which J.J. had been adjudicated delinquent were violent crimes involving deadly weapons and that J.J. refused to accept full responsibility for the offenses he had committed. On this record, we find that "some evidence" exists to support the juvenile court's decision to transfer J.J. to TDCJ. Accordingly, we conclude that the juvenile court did not abuse its discretion. We overrule J.J.'s first issue.

**CONCLUSION**

We affirm the order of the juvenile court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Puryear and Pemberton

Affirmed

Filed:   December 31, 2008

16