

# NUMBER 13-11-00408-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

### IN THE MATTER OF L. G. G., A JUVENILE

**On appeal from the 449th District Court
of Hidalgo County, Texas sitting as a juvenile court.**

# OPINION

**Before Justices Benavides, Vela, and Perkes
Opinion by Justice Perkes**

In February 2007, a juvenile court adjudicated appellant, L. G. G.,[1] delinquent for the offense of capital murder, assessed a determinate sentence of forty years, and placed appellant in the custody of the Texas Youth Commission ("TYC"). The court's sentence carried with it the possibility of transfer to the Texas Department of Criminal Justice, Institutional Division ("TDCJ"), after appellant reached the age of majority.

In June 2011, the trial court entered a transfer order by which it ordered appellant to be transferred to TDCJ to serve the remainder of his sentence. By two issues on appeal,

---

[1] In an appeal from a juvenile-court case, we use an alias to refer to the minor and to the minor's parents or other family members. *See* Tex. R. App. P. 9.8(c)(2).

appellant argues (1) the trial court abused its discretion by entering the transfer order because he was rehabilitated while in TYC custody; and (2) in its transfer order, the trial court failed to award him all of the pre-sentence time credit he deserved. We modify the trial court's transfer order to reflect the proper amount of pre-sentence time credit and we affirm the order, as modified.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On September 11, 2006, appellant and an accomplice, Adrian Sandoval, committed the brutal, premeditated murder of Fernando Villasenor Lopez. Lopez was a drug dealer who was selling cocaine to appellant and his accomplice from a trailer located in their neighborhood. While Sandoval distracted Lopez by showing him a gold necklace, appellant struck him in the head multiple times. Appellant and Sandoval then robbed Lopez of money and cocaine and fled the trailer. Appellant was sixteen years old at the time of the offense.

On January 30, 2007, the 206th District Court of Hidalgo County, Texas, sitting as a juvenile court, held a disposition hearing.[2] Appellant submitted a "Stipulation of Evidence" wherein he judicially confessed that he "intentionally cause[d] the death of an individual, FERNANDO VILLASENOR LOPEZ, by striking said victim on the head with a pipe . . . [and that he] was then and there in the course of committing and attempting to commit the offense of Aggravated Robbery of FERNANDO VILLASENOR LOPEZ . . . ."

On February 1, 2007, the trial court entered its "Judgment of Adjudication and Disposition" and "Order of Commitment" memorializing its findings that appellant "engaged

---

[2] See TEX. FAM. CODE ANN. §§ 54.03, 54.04 (West 2006).

2

in delinquent conduct by committing the offense of CAPITAL MURDER, a capital felony" and that "the child [appellant] was in need of rehabilitation and that the protection of the public and the child [appellant] required that a disposition be made." The trial court ordered that appellant be "committed to the care, custody and control of the Texas Youth Commission with possible transfer to Institutional Division of the Texas Department of Criminal Justice for a term of forty (40) years."

On April 5, 2011, the State filed its motion requesting a hearing on the transfer of appellant's determinate sentence to TDCJ, pursuant to section 54.11 of the Texas Family Code.[3] The trial court[4] subsequently held a transfer hearing regarding whether to transfer appellant to TDCJ to complete the remainder of his sentence or whether to leave him in the custody of TYC for subsequent release to adult parole on his twenty-first birthday, with the remainder of his sentence to be served on parole. The transfer hearing was held shortly before appellant's twenty-first birthday.

On June 8, 2011, the trial court ordered that appellant serve the remainder of his forty-year sentence in TDCJ's custody. This appeal followed.

## II. STANDARD OF REVIEW

We review a juvenile court's decision to transfer a juvenile from TYC to TDCJ for an abuse of discretion. *In re F.D.*, 245 S.W.3d 110, 113 (Tex. App.—Dallas 2008, no pet.); *see also In re P.D.M.*, No. 13-10-00189-CV, 2011 WL 2462978, at *3 (Tex. App.—Corpus Christi June 16, 2011, no pet.) (mem. op.). In deciding whether the juvenile court abused its discretion, we review the entire record to determine if the court acted without reference to

---

[3] *See* TEX. FAM. CODE ANN. § 54.11 (West Supp. 2012).

[4] The record reflects that the trial court is a juvenile court that started hearing cases after the 206th District Court of Hidalgo County, Texas, sitting as a juvenile court, adjudicated appellant delinquent.

any guiding rules or principles. *In re J.J.*, 276 S.W.3d 171, 178 (Tex. App.—Austin 2008, pet. denied); *In re J.L.C.*, 160 S.W.3d 312, 313 (Tex. App.—Dallas 2005, no pet.). If some evidence exists to support the juvenile court's decision, there is no abuse of discretion. *In re F.D.*, 245 S.W.3d at 113; *see also In re D.L.*, 198 S.W.3d 228, 229 (Tex. App.—San Antonio 2006, pet. denied); *In re R.G.*, 994 S.W.2d 309, 312 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). This Court will not substitute its own judgment for that of the juvenile court, nor will we reverse the juvenile court's ruling merely because we disagree with its decision. *In re C.L., Jr.*, 874 S.W.2d 880, 886 (Tex. App.—Austin 1994, no writ); *see also In re P.D.M.*, 2011 WL 2462978, at *3.

On receipt of a referral or request for transfer to TDCJ, the juvenile court is required to hold a hearing to determine whether to transfer the person to TDCJ's custody for the completion of the person's sentence. *See* TEX. FAM. CODE ANN. § 54.11(a), (i) (West 2008). In determining whether to transfer a person from TYC to TDCJ's custody, the juvenile court may consider a number of factors, including: (1) the experiences and character of the person before and after commitment to the youth commission; (2) the nature of the penal offense that the person was found to have committed and the manner in which the offense was committed; (3) the abilities of the person to contribute to society; (4) the protection of the victim of the offense or any member of the victim's family; (5) the recommendations of the youth commission and prosecuting attorney; (6) the best interests of the person; and (7) any other factor relevant to the issue to be decided. *Id.* § 54.11(k); *see also In re J.J.*, 276 S.W.3d at 178. The juvenile court is not required to consider all of the factors, and the court is expressly allowed to consider unlisted but relevant factors. *In re J.J.*, 276 S.W.3d at 178; *In re C.L., Jr.*, 874 S.W.2d at 886. Evidence of each factor listed is not required, and

4

the juvenile court is free, within its discretion, to assign different weights to the factors it considers. *In re J.J.*, 276 S.W.3d at 178.

## III. ANALYSIS

### A. Did the Trial Court Err by Ordering Appellant's Transfer to TDCJ?

By his first issue, appellant argues that the trial court erred by ordering his transfer to TDCJ to serve the remainder of his sentence because the record shows he was rehabilitated while in TYC, before the transfer hearing. In support of his first issue, appellant argues that the transfer order violates the terms of his plea agreement with the State whereby he agreed to admit to the offense and to provide a written confession in exchange for a determinate sentence. Appellant argues that because the agreement provided for possible release to TDCJ, that in light of his rehabilitation, transfer to TDCJ was improper because it showed that, based on the nature of the offense, the transfer to TDCJ was actually a certainty, not just a possibility, even if appellant was rehabilitated while in TYC.

We disagree with appellant's characterization that the record shows the transfer decision was based solely on the nature of the offense he committed, thereby rendering meaningless a promise that transfer to TDCJ was a possibility rather than a certainty. Evidence concerning the nature of appellant's offense is not the only evidence that supports the trial court's decision to transfer. During the transfer hearing, the State and appellant presented extensive evidence. The trial court acknowledged on the record that the evidence of appellant's rehabilitation was significant. However, the trial court also expressed that its biggest concern was that appellant might reoffend and thereby harm someone. The record reflects that in addition to considering the testimony presented at the transfer hearing, the trial court reviewed the exhibits admitted into evidence, which

5

contained information not apparent from the testimony. Our review of the entire record shows that the testimony and exhibits include evidence that supports the trial court's decision to transfer appellant to TDCJ. In many respects, even the testimony of the TYC witnesses supports the decision to transfer, notwithstanding TYC's recommendation against transfer.

**(1)** *The State's Evidence at the Transfer Hearing*

In its opening statement, the State emphasized the murder that appellant committed, but urged the trial court to also consider evidence of other factors. The prosecutor stated "the sound and blare of the blows left co-defendant Adrian Sandoval, in shock and motionless." The prosecutor reminded the trial court that the purposes of the Juvenile Justice Code include protection of the public and the promotion of punishment for criminal acts. The prosecutor stated that even though the trial court would hear positive information about appellant, it should also consider evidence of the nature of the offense and the manner in which it was committed.

**(a)** *Appellant's Accomplice's Testimony*

Appellant's accomplice, Sandoval, testified at the transfer hearing. Sandoval testified that he is ten months older than appellant and that, prior to the murder, he and appellant used "crack" together almost daily, smoked "weed" together, and skipped school together. Sandoval also testified that he was convicted of capital murder for this offense and at the time of the transfer hearing, he was serving a life sentence without the possibility of parole. Sandoval was tried as an adult.

Sandoval's description of the murder that he and appellant committed showed it was brutal and premeditated. Sandoval described how he distracted Lopez while appellant

6

started striking his head with full-force blows. Appellant and Sandoval knew that Lopez carried a gun at all times. In his witness statement, which he provided law enforcement before appellant provided a written statement, Sandoval wrote that, "He hit him so hard I heard what sounded like his skull cracking." Sandoval testified that the murder was very bloody and that there was blood on the walls and on the ceiling of Lopez's trailer.

### (b) *Investigator Max Cantu's Testimony*

Max Cantu, an investigator with the Hidalgo County Sherriff's Office, also testified at the transfer hearing. Investigator Cantu was the lead investigator on the case. He testified that the murder weapon was a wrought-iron pipe. He learned during the course of his investigation that appellant and Sandoval started carrying the pipe with them each time they visited Lopez so that he would get accustomed to seeing them enter the trailer with it. They told Lopez that the pipe was needed for protection from dogs in the neighborhood. Prior to the offense, appellant and Sandoval discussed different weapons they might use. They realized that the heavy iron might kill Lopez, but they decided if he were to die it would spare them retaliation from Lopez or his family members.

Investigator Cantu testified that he learned the details of the offense from Sandoval before appellant decided to provide a written confession. Blood evidence from appellant's clothing (retrieved from appellant's parents' home) and other physical evidence corroborated Sandoval's account of the murder. In a somewhat unusual turn of events, appellant's attorney approached Investigator Cantu stating that appellant wanted to confess. While appellant had previously admitted to only accompanying Sandoval during the murder, in his written confession, dated January 24, 2007, appellant admitted to law enforcement

7

that he dealt the deadly blows to Lopez. Prior to giving his written statement, appellant always maintained Sandoval struck and killed Lopez.

### (c) *The Victim's Mother's Testimony*

The State called the victim's mother, Martina Lopez, as a witness. She testified that her son was murdered two weeks before his twentieth birthday. At the time, he had one child and was expecting another. She testified further that she knew appellant from the neighborhood and that on the day of the murder, her family saw appellant playing basketball and acting normal in the neighborhood. Prior to the murder, she believed appellant was a good kid. At the time of the transfer hearing, she did not believe appellant had served enough time for taking her son's life.

### (d) *Juvenile Probation Officer Norma Gonzalez's Testimony*

The State presented testimony from Norma Gonzalez, the juvenile probation officer who prepared appellant's case for the adjudication hearing. Gonzalez testified that appellant did not have any behavioral issues while in juvenile detention awaiting adjudication. She testified that a drug test administered the day after the offense, when appellant was first in detention, was positive for marihuana, but was negative for cocaine.

### (e) *Other Evidence the State Presented at the Transfer Hearing*[5]

The State's evidence included statements from appellant's parents that were summarized in the Hidalgo County Sheriff's Department's offense report. The statements did not suggest appellant was high on cocaine at the time of the offense. According to the statements, appellant's father and mother picked him up from school at approximately 4:00

---

[5] The record also shows that before the commission of the offense, appellant (1) was frequently truant from school; (2) had disciplinary issues resulting in a history of suspensions and placements in alternative-school settings; and (3) had a chronic drug habit.

p.m. on the day of the murder. They went home and appellant's mother went to work. While appellant's father was repairing his mother's car at home, appellant left to go to Sandoval's house. This happened between 5:00 and 6:00 p.m. Appellant returned home at about 6:15 p.m., and appellant's "in-laws" picked him up between 6:30 and 7:00 p.m. to visit. After appellant's mother finished work, appellant's father picked her up and they picked up appellant from his "in-laws'" house and returned to their own home at about 9:40 p.m. According to appellant's mother, appellant was acting normal and did not appear to be under the influence of any drug that night. She stated that when the family returned home for the night, appellant remained outside with another kid from the neighborhood. He spoke on the phone with his girlfriend and then went inside the house at about 10:00 p.m. and remained in his bedroom.

The State's evidence included a psychological evaluation of appellant, dated January 9, 2007. In the evaluation, appellant's parents reported that he "tended to keep his feelings to himself, and did not communicate much with them." It also stated that appellant scored high on the substance-abuse-proneness scale of a psychological profile.

Appellant's March 9, 2007, psychological intake assessment stated that appellant used cocaine daily, but that he last used it on September 5, 2006, just days before the offense. The same assessment listed appellant's last crack/cocaine use as having occurred in September 2006, the month of the murder.

**(2)** ***Appellant's Evidence at the Transfer Hearing***

In his opening statement, appellant's attorney stated that appellant and Sandoval were under the influence of cocaine at the time of the offense. Counsel also stated that because appellant was rehabilitated during his confinement in TYC, the trial court should not

transfer him to TDCJ. Counsel asked the trial court to return appellant to TYC custody, so that on appellant's twenty-first birthday, TYC could release him to adult parole to live in Austin, Texas where he had an uncle.

### (a) *TYC Program Specialist Lori Pratka's Testimony*

Appellant's first witness was Lori Pratka, a program specialist in the Capital and Serious Violent Offender Treatment Program for TYC's Giddings State School. Pratka testified that the Capital and Serious Violent Offender Treatment Program is a very special program and that a successful graduate's risk of reoffending is greatly diminished. She testified that appellant is a graduate of the program and that he reached the highest level of achievement possible in TYC, the "Youth Empowerment Stage." She testified that appellant's character changed during his four years at TYC and that at the time of the transfer hearing, appellant was confident, cared for himself and others, respected others, and wanted things to be right. Pratka testified further that appellant went from being very silent when he first arrived to being more of a leader. He excelled in academics, having finished his GED, acquired his high-school diploma, and completed some college coursework while in TYC.[6] Pratka told the trial court that she was aware of the nature of the offense appellant committed, but that she did not consider appellant to be a danger to the community. Based on his actions at the TYC state school, Pratka considered appellant an example of successful rehabilitation and concluded appellant would be a contributing member of society if he were released to adult parole.

---

[6] The record shows that, in addition to completing fifteen hours of college coursework, appellant earned multiple vocational certificates in various fields such as "Mill and Cabinetmaking" and "Business Computer Information Systems."

On cross-examination, Pratka said it was her understanding that appellant used cocaine immediately prior to committing this murder, so she could not tell the trial court why the drug test that was performed within hours of appellant entering detention was negative for cocaine. When the prosecutor showed her the murder weapon, Pratka initially deferred to appellant's treating psychologist, Dr. Steven Brownlow, to testify on the issue of whether this was a premeditated offense. However, when pressed, based on appellant's written confession, she agreed the offense was a premeditated murder. Pratka also agreed that there have been youth at the state school who have learned the program and what they needed to say to get what they wanted.

**(b) *Consulting Psychologist Dr. Katherine Hallmark's Testimony***

Dr. Katherine Hallmark, a consulting psychologist, was appellant's next witness. Dr. Hallmark is a Manager of Clinical Services at TYC in Giddings. Dr. Hallmark testified that she did not have a treating or counseling relationship with appellant, and that she had not performed her own psychological evaluation of appellant. She described her role as supervisory and testified that she reviewed Dr. Bradley Norlander's psychological evaluation of appellant.

According to Dr. Hallmark, Dr. Norlander did not work for TYC at the time of the transfer hearing. Dr. Norlander's psychological evaluation was admitted into evidence at the State's request. The evaluation is dated February 2, 2011. The evaluation showed that L.G.G. told Dr. Norlander he snorted cocaine just before the crime. Dr. Norlander included the following in his evaluation:

> Validity scales of the [Minnesota Multiphase Personality Inventory-2] indicate[d] [L.G.G.] answered questions in such a way as to present himself as a conforming person who is highly self-adequate and adjusted. This

11

presentation was not extreme and is expected given the nature of the evaluation. However, test results will be interpreted cautiously as [L.G.G.] was likely to underreport psychological issues or problems. . . . [L.G.G.] expressed his understanding of a need for continued substance abuse treatment and how he has learned the benefit of such treatment while in the . . . programs in TYC . . . [L.G.G.] is unsure if his uncle's apartment complex will allow him to live there due to his offense history. He is working to resolve these issues. If his uncle's home is not approved[,] he is preparing to transition to a halfway house where he will continue to pursue his educational, vocational, personal, family, and social goals.

Based on her review of Dr. Norlander's work and a brief meeting with appellant, Dr. Hallmark agreed with Dr. Norlander's recommendation that appellant should be released to adult parole instead of being transferred to TDCJ.

In support of her recommendation, Dr. Hallmark testified that she believed appellant had addressed his risk factors for re-offending, and that his protective factors also placed appellant at low risk of reoffending. Dr. Hallmark identified substance abuse as appellant's number one weakness. She stated that it would be a frightening thing if appellant relapsed into substance abuse. She testified that appellant started using marihuana and alcohol at age twelve and cocaine at age fourteen. She described the murder as substance-abuse related. Appellant, however, completed the residential Alcohol and Drug Intensive Program while at TYC, and all random drug tests performed on appellant while in TYC were negative.

Dr. Hallmark testified that appellant's family-of-origin risk factors for offending were "family disturbance, substance abuse, [and] lack of emotional connection." She testified that appellant addressed this risk factor through counseling and an increased sense of support from his family. As to protective factors, Dr. Hallmark identified appellant's educational attainment while in TYC as his strongest protective factor against reoffending.

12

She identified his strong work history while in TYC as his second strongest protective factor. She testified that while in TYC, appellant worked hard and was able to save $5,000 which will provide him a cushion while he looks for work in the event he is paroled.

On cross-examination, Dr. Hallmark testified that she would still describe appellant as very quiet. She stated that appellant told her he was high at the time of the murder, but that she did not have drug-testing results that showed he was high. She acknowledged that appellant's parents would not be present in Austin to support him if he were paroled. She also admitted that he did not have a job lined up in the event of parole release, and that his criminal murder record would not be sealed. Dr. Hallmark also conceded that education is not a guaranteed protective factor against reoffending, that some offenders do well in a highly-structured environment, but "things fall to pieces when they hit the streets." She agreed with the prosecutor that some offenders go through the motions at TYC to achieve parole release, but they are not really rehabilitated.

**(c)** *Treating Psychologist Dr. Steven Barlow's Testimony*

Dr. Steven Barlow, a treating clinical psychologist at TYC, testified at the transfer hearing. Dr. Barlow testified that he had been a licensed psychologist for just under one year at the time of the hearing, but that he had started participating in appellant's care and treatment approximately fifteen months prior to the hearing. He started working with appellant in intensive group therapy. The group met two to three times per week for about eleven months. Each meeting lasted about three to four hours.

Dr. Barlow testified that the group therapy has two main components, a life-story component and a crime-story component. As to the life-story component, Dr. Barlow stated that appellant was very open about his early background and family history, but that he had

difficulty processing and working through his emotions. According to Dr. Barlow, appellant had a profound inability to trust other people and to open up to them. Appellant had extreme difficulty with the emotional aspects of the life-story component of therapy.

Dr. Barlow described what he called a break through for appellant in group therapy. During a role play of his family of origin, appellant became very angry and "looked like he was going to assault one of the other youth who was playing" appellant's father. Appellant later became very reticent in group therapy and did not say anything for a couple of sessions. He admitted to Dr. Barlow that his mom had called him at TYC and shared upsetting information concerning his father's activities. According to Dr. Barlow, when appellant discussed this family history in group therapy, he opened up, expressed a lot of emotions, and was able to receive feedback on how to cope with his family history.

As to the crime-story component of group therapy, Dr. Barlow testified appellant took responsibility for the murder and role-played the offense as the offender and the victim. Dr. Barlow believed appellant showed genuine remorse for the murder.

Dr. Barlow testified that people like appellant who successfully complete the therapy are much less likely to recidivate than people who do not complete the group therapy. As appellant's therapist, Dr. Barlow felt strongly that it was not his place to recommend for or against release to parole. He believed, from a therapeutic standpoint, that a transfer to TDCJ would not be in appellant's best interest and that appellant was rehabilitated. Dr. Barlow testified that of the people he "met at the State School, including most of the staff, [he] would feel more comfortable having [appellant] living in [his] neighborhood than most anybody else. . . ." Excluding the near assault in group therapy, he never saw appellant act aggressively. He described appellant as having a pleasing, easygoing personality.

14

Dr. Barlow admitted that appellant needed further therapy to help him open up and confront negative situations when they arise. He testified that parole would not provide appellant therapy, work, or housing. He testified further that it was his understanding appellant was high when he committed the murder. When asked why appellant tested negative for cocaine shortly after the murder, Dr. Barlow stated that sometimes drug tests are inaccurate.

### (d) *TYC Court Liaison Leonard Cucolo's Testimony*

Appellant called Leonard Cucolo as a witness. Cucolo was TYC's court liaison. Cucolo met appellant when appellant first arrived at TYC, but did not have any ongoing relationship with him. He testified that if paroled, because of the gravity of the offense, appellant would be subject to electronic monitoring and would only be allowed to leave the halfway house for purposes such as work, school, or church attendance. He testified that on parole, appellant could move out of the half-way house once appellant established his own residence. Cucolo testified that while in TYC, appellant did everything possible to improve and performed exceptionally well. He believed the TYC programs appellant completed rendered him "able to work on reducing any possible offense in the future." According to Cucolo, appellant was promoted to being the highest-paid offender in TYC, earning $2.50 per hour, despite a starting wage of .50 per hour. Cucolo testified that appellant spent very little money on himself and had paid $1,800 in child support while in TYC.

Cucolo admitted that he had a reservation in recommending appellant for parole release. He felt strongly that for the safety of Lopez's family and in the interest of giving

appellant a fresh start, appellant should not return to Hidalgo County for the duration of his sentence. Cucolo felt it was better that appellant be paroled in Austin.

**(e)** *Appellant's Testimony*

Appellant testified at the transfer hearing. He admitted that prior to giving his written confession, he blamed Sandoval for murdering Lopez. He testified that his written confession was truthful. Appellant stated that he was under the influence of cocaine on the day of the murder and that the plan was to rob Lopez, but not to kill him. Appellant testified that through the TYC rehabilitation program, he learned that drugs impact his brain so as to prevent him from seeing things as they really are. He admitted that he could relapse into drug addiction at any moment, but testified that he had not used drugs or joined any gang while at TYC. Appellant testified about his educational achievement at TYC. He also testified that while working at TYC, he was promoted to supervisor and allowed to work off-campus at times. He stated that he started sending child-support money to his daughter because he felt it was his responsibility to do so.

**(3)** *Conclusion*

To summarize, while there is evidence in the record of appellant's rehabilitation, there is also evidence that he committed a brutal, premeditated murder, after which he proceeded to act normal. The trial court, recognizing the seriousness of appellant's violent offense, was allowed to consider that appellant would have served less than five years before his release from TYC, and that the goals of punishment, accountability, and the protection of the community would be better served by transferring appellant from TYC to TDCJ. *See* TEX. FAM. CODE ANN. § 51.01 (West 2008); *see also In re J.D.P.*, 149 S.W.3d 790, 796 (Tex. App.—Fort Worth 2004, no pet.); *K.L.M. v. State*, 881 S.W.2d 80, 83–86 (Tex. App.—Dallas

16

1994, no writ) (citing Robert O. Dawson, *The Third Justice System:  The New Juvenile-Criminal System of Determinate Sentencing for the Youthful Violent Offender in Texas*, 19 ST. MARY'S L.J. 943, 949 (1987–88)).  In the event appellant was not transferred to TDCJ, TYC believed that the safety of the victim's family warranted excluding appellant from Hidalgo County for the remainder of his sentence.  The evidence also shows that appellant would benefit from additional therapy to manage his emotions; that such therapy would not be offered through parole; that appellant nearly assaulted someone in group therapy during a role-play exercise; and that if he lived in Austin, he will have little family support.  Appellant had not secured a job in the event he was paroled instead of being transferred to TDCJ, and his criminal record would not be sealed.

On this record, there is some evidence to support the trial court's decision to transfer appellant to TDCJ.  Therefore, we cannot conclude the trial court abused its discretion by ordering the transfer.  *See In re J.J.*, 276 S.W.3d at 180; *see also In re P.D.M.*, 2011 WL 2462978, at *4.  Appellant's first issue on appeal is overruled.

**B.      Did the Trial Court Misstate Appellant's Time Credit in its Transfer Order?**

By his second issue on appeal, appellant asks this Court to modify the trial court's transfer order so that he receives time credit from the date of his initial detention, September 12, 2006, through the date of his transfer to TDCJ.  As written, the trial court's transfer order only gives appellant time credit for the period of detention that appellant spent in TYC, starting on January 30, 2007.  The State agrees that appellant is entitled to the time credit he seeks by his second issue.

Generally, a juvenile should be awarded time credit for time spent in juvenile detention when he is later sentenced to adult prison for the same offense.  *See e.g.*, *Ex*

*parte Green*, 688 S.W.2d 555, 556–57 (Tex. Crim. App. 1985). The preferred practice is for the trial court to award pre-sentence time credit and for the trial court to correct any errors in the amount of time credit awarded by judgment nunc pro tunc. *See* TEX. CODE CRIM. PROC. ANN. art. 42.03, § 2(a) (West 2011); TEX. R. APP. P. 23.2(b); *Ex parte Evans*, 964 S.W.2d 643, 645 n.2 (Tex. Crim. App. 1998); *Ex parte Harvey*, 846 S.W.2d 328, 329 (Tex. Crim. App. 1993).

In *Rodriguez v. State*, we held that when a defendant has filed a motion for judgment nunc pro tunc to correct a time-credit error, and the trial court refuses to rule on the motion, the proper remedy is to seek mandamus relief.[7] *Rodriguez v. State*, No. 13-07-00539-CR, 2009 WL 1801264, at *2 (Tex. App.—Corpus Christi June 25, 2009, no pet.). In so holding, however, we noted that an appellate court ordinarily has the power to correct a clerical error in a judgment when the evidence necessary to correct the judgment appears in the record on direct appeal. *Id.* at *3 n.8. As such, the appellate court is permitted to correct the clerical error in the amount of time credit awarded, notwithstanding the fact that no motion for judgment nunc pro tunc was filed in the trial court. *Compare id.* at *2 *with Phillips v. State*, 64 S.W.3d 458, 461 (Tex. App.—Houston [1st Dist.] 2001, no pet.). In *Rodriguez*, we

---

[7] Unlike a direct appeal, on habeas review, the Texas Court of Criminal Appeals will not grant relief that may be obtained by filing a proceeding nunc pro tunc in the trial court because the scope of felony, post-conviction habeas review under Code of Criminal Procedure article 11.07 is limited. *See* TEX. CODE CRIM. PROC. ANN. art. 11.07 (West Supp. 2007); *Ex parte Ybarra*, 149 S.W.3d 147, 148 (Tex. Crim. App. 2004) (per curiam) (citing *Ex parte Pena*, 71 S.W.3d 336, 336–37 (Tex. Crim. App. 2002)). Accordingly, when exercising its jurisdiction under article 11.07, the Court of Criminal Appeals does not grant pre-sentence, jail-time credit that can be obtained by seeking judgment nunc pro tunc in the trial court. *See Ex parte Ybarra*, 149 S.W.3d at 149; *see also Ex parte Deeringer*, 210 S.W.3d 616, 617–18 & n.7 (Tex. Crim. App. 2006) (explaining that a claim for pre-sentence time-credit is not cognizable by way of an article 11.07 habeas application unless an inmate is being confined beyond his presumptive discharge date so that the claim is one for illegal confinement).

did not have sufficient information before us to accurately determine the precise amount of time credit to which the defendant was entitled.   *See* 2009 WL 1801264, at *3 n.8.

In this case, however, the record includes sufficient information for us to calculate the exact amount of time credit that appellant should have been awarded in the transfer order. Specifically, the record shows that appellant was continuously detained from September 12, 2006 through the time he was transferred to TDCJ to serve the remainder of his sentence. The record also shows that the juvenile court intended to award appellant time credit from September 12, 2006, to the time of his transfer to TDCJ.   Specifically, in the February 1, 2007 order adjudicating appellant delinquent, the juvenile court found that appellant was entitled to time credit from September 12, 2006 to February 1, 2007.   The State concedes that this time period should have been included in the amount of time credit awarded by the transfer order.

Pursuant to the February 1, 2007, juvenile court order, appellant was transferred to TYC's custody until the trial court entered its transfer order.   The trial court's transfer order provides that appellant be awarded time credit for time spent in TYC from January 30, 2007 to June 8, 2011, but it fails to address the time appellant spent in juvenile detention between September 12, 2006 and January 30, 2007.   Appellant is entitled to credit for the entire time period he spent in custody prior to his transfer to TDCJ.   *See e.g.*, *Ex parte Green*, 688 S.W.2d at 556–57.   We sustain appellant's second issue.

## IV.   CONCLUSION

We modify the trial court's "Order of Transfer to the Institutional Division of the Texas Department of Criminal Justice" to state, "L. G. G. is entitled to pre-sentence time credit from September 12, 2006 through June 8, 2011," and to delete the reference on the second page

19

of the order that appellant should receive time credit "from January 30, 2007 to today's date."

As modified, we affirm the trial court's Order of Transfer to the Institutional Division of the

Texas Department of Criminal Justice.

 

                                                       _____

                                                       Gregory T. Perkes
Justice

Delivered and filed the
6th day of December, 2012.