# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-21-00413-CV

---

### In the Matter of D. E. P.

---

**FROM THE COUNTY COURT AT LAW NO. 1 OF HAYS COUNTY
NO. 5099, THE HONORABLE DAVID GLICKLER, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

In April 2018, the trial court found that appellant D.E.P., a juvenile, had engaged in delinquent conduct, specifically capital murder, and assessed a determinate sentence of ten years in the custody of the Texas Juvenile Justice Department (TJJD).  In July 2021, the trial court ordered D.E.P., now an adult, to serve the remainder of his sentence in the Institutional Division of the Texas Department of Criminal Justice (TDCJ).  In a single issue on appeal, D.E.P. asserts that the trial court abused its discretion in ordering his transfer to TDCJ.  We will affirm the trial court's order.

## BACKGROUND[1]

On June 19, 2017, the victim, Ryan Kincaid, was shot and killed during an attempted robbery.  D.E.P., who was fourteen years old at the time of the offense, and his accomplice, G.O., had arranged to purchase marijuana from Kincaid at a laundromat in San Marcos.  When D.E.P. and G.O. arrived at the location and met with Kincaid, G.O. pulled out a

---

[1] The following factual summary is based on evidence admitted at the transfer hearing.

gun, told Kincaid to get out of his vehicle, and shot Kincaid when Kincaid indicated that he did not believe the gun was loaded and "took a swing at [G.O.]" Kincaid walked approximately five feet and then fell to the ground. D.E.P., who later told police that he was not expecting G.O. to shoot Kincaid, got out of his car and jumped into Kincaid's vehicle, ran over Kincaid with the vehicle, and fled the scene.[2] Police later found and apprehended D.E.P., who admitted to them that he knew G.O. had planned on robbing Kincaid and was aware that G.O. always carried a gun with him.

D.E.P. was charged with capital murder and, pursuant to a plea deal with the State, pleaded true to the allegations against him and was given a ten-year determinate sentence. *See* Tex. Hum. Res. Code § 245.051(c)(1). He was fifteen years old at the time he was sentenced. Three years later, the trial court held a hearing to determine whether D.E.P., who was now an adult, should serve the remainder of his sentence in TDCJ. The district court ordered him transferred. This appeal followed.

## STANDARD OF REVIEW

We review a trial court's decision to transfer a juvenile to TDCJ for abuse of discretion. *In re J.J.*, 276 S.W.3d 171, 178 (Tex. App.—Austin 2008, pet. denied). In deciding whether the trial court abused its discretion, we review the entire record to determine if the court acted without reference to any guiding rules or principles. *Id*. If "some evidence" exists to support the trial court's decision, there is no abuse of discretion. *Id*.

---

[2] D.E.P. told police that he had hit another car, not Kincaid.

**DISCUSSION**

In his sole issue on appeal, D.E.P. asserts that the trial court abused its discretion in ordering his transfer to TDCJ. Although he concedes that the standard of review is a "very difficult hurdle to overcome," he argues that he "has come a very long way" from the person he was at his adjudication hearing and that incarceration would not be in his best interest.

After a child committed to the custody of TJJD becomes 16 years of age but before the child becomes 19 years of age, TJJD may refer the child to the trial court for approval of the child's transfer to TDCJ if the child has not completed his sentence and the child's conduct indicates that the welfare of the community requires the transfer. *See* Tex. Hum. Res. Code § 244.014(a). On receipt of a referral from TJJD, the trial court is required to hold a hearing on the matter. *See* Tex. Fam. Code § 54.11(a). At the conclusion of the hearing, the trial court may either authorize the person to be released on adult parole or transfer the person to the custody of TDCJ for the completion of the person's sentence. *See id*. § 54.11(i), (j). In making this determination, the trial court may consider the following factors:

(1) the experiences and character of the person before and after commitment to TJJD;

(2) the nature of the penal offense that the person was found to have committed and the manner in which the offense was committed;

(3) the abilities of the person to contribute to society,

(4) the protection of the victim of the offense or any member of the victim's family;

(5) the recommendations of TJJD and the prosecuting attorney,

(6) the best interests of the person; and

(7) any other factor relevant to the issue to be decided.

*Id*. § 54.11(k). The trial court is not required to consider all the factors, the State is not required to present evidence of each factor, and the court is expressly allowed to consider unlisted but relevant factors. *J.J.*, 276 S.W.3d at 178 (citing *In re C.L.*, 874 S.W.2d 880, 886 (Tex. App.—Austin 1994, no writ)). Additionally, the trial court may assign different weights to the factors it considers. *Id*.

The evidence admitted at the transfer hearing included the testimony of Alanna Bennett, a court liaison for TJJD, who had reviewed D.E.P.'s file and testified as to its contents. The file, which was admitted into evidence, included a psychological evaluation by Dr. Laura Washington, who concluded that D.E.P. was at a moderate to high risk for recidivism, that D.E.P. was making progress in his treatment and "had made it all the way to the highest stage" of TJJD's treatment program, but that "he had been demoted in those stages due to recent assaultive and disruptive behavior." Bennett testified that D.E.P. had suicidal ideations and had attempted to commit suicide while in TJJD; and had a history of substance abuse including marijuana, cocaine, and alcohol. Although D.E.P. "excelled in education" and was making "very good progress" in TJJD's behavioral program, he "started to decline" in December 2020. Over the course of his time in TJJD, D.E.P. had been referred to the Regulation and Safety Unit, an isolation unit at TJJD, 165 times, and he had been admitted to the unit 90 times, which Bennett testified were "relatively high" numbers. At least eight of the referrals were for "assaultive behavior," at least one was for "gang-related behavior," and seven "were for safety, which means usually that it was some type of suicidal tendencies or behavior or ideation." Additionally, 52 of

4

the referrals were "self-referrals," which is "when a youth asks staff to send them" to isolation either as a "coping" mechanism or as a form of "manipulation" "to get out of situations . . . if they know they're going to get in trouble."

Bennett further testified that TJJD's initial recommendation for D.E.P. was parole but that recent instances of assaultive behavior had caused TJJD to withdraw that recommendation. Bennett explained that based on D.E.P.'s history of "not being able to regulate his emotions," "acting out," committing "assaultive behaviors" and "disruptions," "not being able to follow basic rules," and "engaging in risky behavior even when the stakes are high," TJJD believed that it was "more likely than not" that D.E.P. would commit crimes if released on parole.

D.E.P. called multiple character witnesses on his behalf, including staff members at TJJD who knew him and his aunt and uncle with whom he would be living if he were placed on parole. Each witness testified as to why they believed D.E.P. should be released on parole instead of sent to prison. Other staff members at TJJD also wrote letters to the court recommending that D.E.P. be placed on parole.

D.E.P. testified that he felt remorse for the murder and took "responsibility for playing a part in what [he] did." D.E.P. explained that he sold drugs and robbed people before his time at TJJD because he was trying to provide food and shelter for his mother and younger siblings, who were homeless at the time. When he was twelve years old, D.E.P. was "snorting meth," "smok[ing] weed, do[ing] coke, anything [he] could get [his] hands on [] just to make [him] feel better at that point in time." He had obtained the drugs from his parents.

5

When discussing his experiences at TJJD, D.E.P. expressed pride in his academic accomplishments and testified that he had joined a gang there "just for protection." D.E.P. also testified that if he was placed on parole, he would like to become active in the community and "help kids before they get into the system or before they get, like, further down the line where they get locked up or get in trouble." He added, "I could tell them my story, give them background about me, and be, like, Look, I made it. A 14-year-old kid that committed capital murder, like, all the odds against him became someone successful."

On cross-examination, D.E.P. was asked about his assaultive behavior at TJJD. He explained,

> I did mess up. I did have backslides, but those backslides, they were like—when you're getting close to home, misery loves company, like they say.
>
> Kids would, like—they'd see it and they would try to take it—take advantage of you. And once you get took advantage of, you're automatically a mark. . . .
>
> And, like, the fights—the fights. When I got in fights, they weren't fights. Honestly, like, there's no self-defense at TJJD. But when they finally got a swing on me, I got them and I put them on the ground. Like, I take them to the ground and I hold them. That's like most [of] my fights. You can view the cameras. I held the kid until the staff got there or until one of us got sprayed and I let him go.

When asked to explain his recent conduct that had caused TJJD to withdraw its recommendation for parole, D.E.P. blamed the incidents on his being moved to a "rough pod" with younger offenders who wanted to fight him because they had "nothing to lose" and "something to prove," and he had to defend himself: "I was white, and, like, I'm kind of big, you know, my size, like, they feel like they can just pick on me and beat me up and stuff like that and, you know, I'm not going to do nothing about it. I'm going to defend myself."

6

In summary, there was evidence both favorable and unfavorable to D.E.P. There was evidence that because of his parents, D.E.P. had experienced homelessness, poverty, abuse, and drug use as a child, and by all accounts his time at TJJD had resulted in some rehabilitation. He had "excelled in education" while at TJJD and had at one point reached the "highest stage" of TJJD's treatment program. Moreover, multiple witnesses testified to D.E.P.'s good character and recommended that he be placed on parole, and his aunt and uncle provided testimony that they would be able to provide him with a loving, supportive, and stable home upon his release.

On the other hand, there was also evidence that D.E.P. was at a moderate to high risk of recidivism if he were to be released on parole, and although he had reached the highest stage of TJJD's treatment program, he had recently been "demoted" to a lower stage because of recent assaults that he had committed. Due to this behavior, TJJD had withdrawn its recommendation that D.E.P. be released on parole. From this evidence, the trial court could have reasonably inferred that D.E.P. was regressing rather than progressing in his rehabilitation. During his three years at TJJD, D.E.P. had been referred to the isolation unit 165 times and had been admitted to the unit 90 times. These included at least eight referrals for "assaultive behavior," at least one referral for "gang-related behavior," and 52 self-referrals, which Bennett testified could be used by juveniles as either a "coping" mechanism or as a form of "manipulation" "to get out of situations . . . if they know they're going to get in trouble." Additionally, D.E.P. had committed the offense of capital murder, which D.E.P. acknowledges in his brief is a "very serious offense." At the time of the transfer hearing, D.E.P. had served only three years of his ten-year sentence. The trial court could have reasonably inferred that because of the seriousness of the offense, releasing D.E.P. on parole would not be in either D.E.P.'s or the community's best interest.

7

At least "some evidence" supports the trial court's decision to transfer D.E.P. to TDCJ to serve the remainder of his ten-year sentence for capital murder. Accordingly, we cannot conclude on this record that the trial court abused its discretion. *See In re N.K.M.*, 387 S.W.3d 859, 864–65 (Tex. App.—San Antonio 2012, no pet.); *J.J.*, 276 S.W.3d at 178–80.

We overrule D.E.P.'s sole issue on appeal.

## CONCLUSION

We affirm the trial court's transfer order.

_____

Gisela D. Triana, Justice

Before Justices Goodwin, Baker, and Triana

Affirmed

Filed: August 24, 2022