

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00261-CV

_____

IN THE MATTER OF P.S.

On Appeal from the 415th District Court
Parker County, Texas
Trial Court No. JV16-0043

Before Birdwell, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

Appellant P.S. appeals the trial court's order transferring him from the custody of the Texas Juvenile Justice Department (TJJD) to the Texas Department of Criminal Justice's Institutional Division (TDCJ). As a juvenile in May 2017, P.S. pled true to five first-degree-felony counts of aggravated sexual assault of a child, *see* Tex. Penal Code Ann. § 22.021, and was given a seven-year determinate sentence with the possibility of a transfer to TDCJ, *see* Tex. Fam. Code Ann. § 54.04(d)(3)(A)(ii). After a June 2019 hearing, the trial court ordered P.S. transferred to TDCJ to serve the remainder of his seven-year sentence. On appeal, P.S. argues that this order was an abuse of the trial court's discretion. We disagree and affirm the trial court's order.

## Background

P.S. admitted to twice forcibly sodomizing two eight-year-old children, a girl and a boy, and once forcing the young girl to perform oral sex. The trial court found that P.S.'s and the community's best interest would be best served by committing him to TJJD for seven years, in part due to the seriousness of the aggravated-sexual-assault offenses, a history of aggressive behavior, and the inadequacy of local resources available to properly rehabilitate P.S. After two years in TJJD's custody at Gainesville State School, P.S. returned to the trial court a week before his nineteenth birthday in June 2019 for a determination of whether he should be released on parole or transferred to TDCJ.

2

At the hearing, the trial court heard testimony about P.S.'s fifty-seven write-ups for misconduct while at Gainesville State School. Forty of those took place in an eighty-day span of detention prior to his transfer to the high-restriction facility at Gainesville State School. And while most of the infractions were for minor rule violations—such as taking too long in the shower, not making his bed, or talking out of turn—at least five were for major rule violations which would have been considered crimes if committed outside the system. He received five infractions for refusing to submit to handcuffs, and eight incidences resulted from threats to hurt himself or his peers. In one particular instance, he refused to comply with a supervisor's order, said that the supervisor was not in charge and that his peers would listen to him instead, and refused to be handcuffed. As the trial court summarized at the end of the hearing, the infractions held a common thread of defiance—"a request to comply with the preexisting rule, which was essentially a pretty simple task that he was required to perform and requested to perform to which he replied I'm not going to do it."

Despite this recorded history of misconduct, Kim Buck testified on behalf of TJJD to its recommendation that P.S. be released on parole. She dismissed 39% of his infractions as P.S.'s "[j]ust doing teenage stuff." Her testimony also emphasized P.S.'s accomplishments while in TJJD's custody. He participated in three specialized treatment programs in addition to the school's general program: a sex-offender treatment program, an alcohol-and-drug treatment program, and an aggression-

3

replacement training program; he earned his high school diploma, a welding certification, and a forklift-operator certification; and he voluntarily participated in victim-awareness activities, trauma-focused equine-assisted psychotherapy, psychological services, and a tattoo-removal program. He also completed an invitational "Man of Distinction" program intended to "increase students' life skills and to help prepare them as they move forward from TJJD," and, in the opinion of a program volunteer, he had "mature[d]," "demonstrate[d] great perseverance in dealing with issues, and . . . ha[d] the potential with the academic background he has in place now and his interest in continuing that education . . . to be a productive citizen." By the time of the hearing, P.S. had reached the last stage of the TJJD rehabilitation program, the "YES-Active" stage when a youth "demonstrates leadership skills, has very few behavioral problems, [works monthly] on the reintegration plan, and is kind of a peer leader."

Elaborating on the treatment programs P.S. completed, Buck testified that he entered TJJD with serious alcohol- and drug[1]-abuse issues, with his addiction issues comprising "a huge portion" of his file that included notations throughout about "the need to keep him sober and keep him on task with respect to rehabilitation." While at Gainesville State School, he completed a six-month, intensive alcohol-treatment

---

[1]His file noted diagnoses of severe cannabis use disorder; severe sedative, hypnotic, or anxiolytic disorder; moderate alcohol use disorder; and moderate hallucinogenic disorder.

program; however, it took P.S. a little over a year to complete it. He also twice completed aggression-replacement training, used to teach "aggression[ and] anger management tools [and] how to respond to situations . . . without the use of aggression." According to Buck, he completed the training after being sanctioned for "telling the supervisor that he wasn't going to participate in movement."

The State expressed particular concern with P.S.'s participation in the sex-offender treatment program. First, the State emphasized discrepancies between P.S.'s detailing of the events and the offenses with which he was charged and to which he pled true. The State found this concerning because a key component of sex-offender treatment is the offender's giving a "complete and accurate detailed offense cycle." It also took issue with the absence of a polygraph exam, calling upon P.S.'s former probation officer as a witness to testify that a polygraph is "the best tool" in sex-offender treatment because it "holds [offenders] accountable."

Nevertheless, TJJD's diagnostic summary concluded that P.S. had "low medical treatment needs, low mental health treatment needs, no intellectual disability treatment needs, moderate sexual behavior treatment needs, low serious violent offender treatment needs, and moderate substance abuse needs." Buck based her recommendation for parole on P.S.'s completion of the general rehabilitation program and assigned programming, and his "active[] demonstrat[ion of] a leadership role with his peers," though she also recommended that P.S. complete a "[s]uperintensive supervision program" asked of all Texas juveniles who have not finished their

5

minimum sentences. She described this superintensive supervision program as "house arrest" for "about a year," during which the juvenile "wears a monitor[,] . . . has to plan his upcoming week with his parole officer[,] . . . and cannot deviate from that." In the program, P.S.'s activities would essentially be limited to school, aftercare, and visiting his parole officer.

Buck had worked with P.S. and his half-sister ("Sister") to develop a plan for P.S. to live with Sister and her husband in California upon release from TJJD. Sister testified that she understood the offenses to which P.S. had pled true and that she and her husband were willing to welcome P.S. into their home and help him start over, including helping him "get going" with a bank account, résumé, and job. She averred that he would have to go to therapy once a week, whether court-ordered or not, and claimed that she had already started working to find a therapist for him. Buck admitted, however, that she was unsure of Texas's ability, if any, to enforce a superintensive supervision program if P.S. were to move to California.

In closing, the prosecutor candidly argued that she felt the "facts and circumstances of the underlying offense [were] way more important to [her] apparently than to TJJD" and emphasized the sexual abuse he pled true to committing against two eight-year-old children. She also expressed concern about Texas's ability to ensure that P.S. would follow any parole conditions if he were to move to California.

P.S.'s counsel took issue with the trial court's "broad stroke" characterization of P.S.'s disciplinary misconduct as a thread of "defiance" and relied on Buck's testimony that P.S. did not exhibit a behavioral problem.

The trial court pointed out the fifty-seven infractions in the file and explained, "[O]ne thing I have here is a young person, not yet an adult, telling his elders and his supervisors, essentially, I'm not going to do what you say while he has this significant offense hanging over his head." The trial court then granted the State's request to transfer P.S. to TDCJ.

## Discussion

On appeal, P.S. argues that the trial court abused its discretion by transferring him to the custody of TDCJ. We review the trial court's decision to transfer a juvenile from TJJD to TDCJ for an abuse of discretion. *In re A.M.*, No. 02-17-00029-CV, 2017 WL 2812452, at *5 (Tex. App.—Fort Worth 2017, no pet.) (mem. op.). "We are to review the entire record to determine whether the trial court acted without reference to any guiding rules and principles. We may not reverse a trial court's decision merely because we disagree with that decision, so long as the trial court acted within its discretionary authority." *In re J.D.P.*, 149 S.W.3d 790, 792 (Tex. App.—Fort Worth 2004, no pet.). An abuse of discretion does not occur when some evidence of substantive and probative character supports the trial court's decision. *A.M.*, 2017 WL 2812452, at *5.

7

P.S. argues that the trial court abused its discretion by declining to follow TJJD's recommendation of parole, but the trial court was not bound to follow TJJD's recommendation. *See, e.g.*, *K.L.M. v. State*, 881 S.W.2d 80, 84–85 (Tex. App.—Dallas 1994, no writ) ("[T]he trial court does not have to follow the recommendations of state officials at the [Texas Youth Commission]."). Rather, it is but one factor the trial court *may* consider in a release hearing:

> [T]he court may consider the experiences and character of the person before and after commitment to [TJJD] or post-adjudication secure correctional facility, the nature of the penal offense that the person was found to have committed and the manner in which the offense was committed, the abilities of the person to contribute to society, the protection of the victim of the offense or any member of the victim's family, the recommendations of [TJJD], county juvenile board, local juvenile probation department, and prosecuting attorney, the best interests of the person, and any other factor relevant to the issue to be decided.

Tex. Fam. Code Ann. § 54.11(k). "Within its discretion, the trial court may assign different weights to the factors it considers, and the court need not consider every factor." *In re H.C.*, No. 02-15-00149-CV, 2016 WL 354297, at *2 (Tex. App.—Fort Worth Jan. 28, 2016, no pet.) (mem. op.).

The trial court was therefore not bound by TJJD's recommendation as reported by Buck. It could, and presumably did, consider the prosecutor's recommendation that P.S. be transferred to TDCJ, largely in light of the disturbing nature of P.S.'s original offenses: repeated violent sexual abuse of two young children. *See* Tex. Fam. Code Ann. § 54.11(d) (allowing consideration of prosecutor's

recommendation); *In re L.G.G.*, 398 S.W.3d 852, 856–57 (Tex. App.—Corpus Christi–Edinburg 2012, no pet.) (affirming trial court's decision not to follow youth commission's recommendation of parole, based in part on violent nature of original offense of murder); *cf. K.L.M.*, 881 S.W.2d at 85 (explaining that the violent nature of a juvenile offense may be considered, in part because "the determinate sentencing law seeks to employ the 'harsh consequences' of the criminal system by allowing a juvenile sentenced under the law to be transferred to the TDCJ"). The trial court also weighed evidence of P.S.'s accomplishments against evidence of his fifty-seven infractions, bound by a common theme of defiance and inability to follow directions and respect authority. *See L.G.G.*, 398 S.W.3d at 856–57 (explaining that although evidence of appellant's rehabilitation was "significant," evidence also supported trial court's concern that appellant would reoffend and harm someone else). The trial court could have also concluded that P.S.'s plan to move to California with Sister was fatally undermined by the fact that TDCJ could not ensure enforcement of supervisory restrictions outside of Texas.

Considering the record as a whole, we cannot conclude that the trial court here acted arbitrarily, unreasonably, or without reference to any guiding rules and principles when it ordered that P.S. be transferred to TDCJ. *See, e.g., A.M.*, 2017 WL 2812452, at *5 (holding similarly); *In re D.T.*, 217 S.W.3d 741, 743–44 (Tex. App.—Dallas 2007, no pet.) (holding transfer was within discretion where appellant had sexually assaulted seven-year-old boy and his in-custody accomplishments were

9

overshadowed by continued disciplinary problems). We therefore hold the trial court did not abuse its discretion and overrule P.S.'s sole issue.

## Conclusion

Having overruled P.S.'s only issue on appeal, we affirm the trial court's order transferring him to the custody of TDCJ.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: July 30, 2020