**Opinion issued June 12, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23-00584-CV

———————————

## IN THE MATTER OF J. C. M.

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2021-00643J**

---

## MEMORANDUM OPINION

Appellant J.C.M.[1] challenges the juvenile court's order transferring him from the Texas Juvenile Justice Department (TJJD) to the Texas Department of Criminal Justice's Institutional Division (TDCJ-ID) to serve the remainder of his sentence for capital murder. We affirm.

---

[1] Pursuant to TEX. FAM. CODE § 56.01(j), the juvenile is identified by his initials.

**Background**

In December 2021, J.C.M. signed a stipulation judicially confessing to capital murder that occurred in December 2020. J.C.M. entered the stipulation without an agreed recommendation as to the court's disposition of the determinate sentence. The underlying offense, which J.C.M. committed at age 17, involved J.C.M. and another youth confronting the complainant before J.C.M. shot and killed him. J.C.M. left the scene with the complainant's cash and marijuana. The trial court found J.C.M. delinquent, and he received a 25-year determinate sentence. *See* TEX. PENAL CODE § 19.03 (capital murder); *see also* TEX. FAM. CODE § 53.045(a)(2) (providing that capital murder is eligible for determinate sentencing). J.C.M. was committed to TJJD.

A.    **Early Transfer Hearing February 2023**

In February 2023, TJJD sought a transfer hearing, recommending J.C.M.'s early transfer to TDCJ-ID because of disciplinary issues and assaultive behavior. *See* TEX. HUM. RES. CODE § 244.014(a) (stating TJJD may refer juvenile to juvenile court for transfer to TDCJ if 16-to-19-year-old juvenile's conduct "indicates that the welfare of the community requires the transfer," and he is serving but has not completed his sentence). The juvenile court held a release or transfer hearing pursuant to Section 54.11 of the Texas Family Code. *See* TEX. FAM. CODE § 54.11. J.C.M. was present and represented by counsel. At the end of

the hearing in J.C.M.'s case, the juvenile court could either (1) order him returned to TJJD; or (2) transfer him to the TDCJ-ID to complete his sentence. *See id.* § 54.11(i).

TJJD court liaison Alana Bennett testified at the hearing. The court also admitted her report and documentation into evidence. Bennett stated that J.C.M. was in the 12th grade and was working toward a welding certification. During his time in TJJD, J.C.M. had 16 behavioral incidents, 10 of which were referrals to the regulation and safety unit.[2] Twelve of J.C.M.'s incidents were major rule violations proven through eight due process hearings. Bennett stated that most of the incidents were for assaultive behavior. Bennett testified that TJJD recommended J.C.M.'s early transfer to TDCJ-ID because J.C.M.'s assaultive violations raised concerns that his pattern of violent behavior would continue upon his release to the community.

Bennett testified that in August 2022, after getting in several fights, J.C.M. was sent to the Redirect Program at TJJD's Evins Regional Center. Bennett testified that the Redirect Program is a specialized program to teach youth how to deal with aggression they encounter when they arrive at TJJD. J.C.M. successfully completed the program. In October 2022, after completing the Redirect Program,

---

[2] The regulation safety unit is a self-contained program for youth who exhibit behavior that is assaultive or disruptive to the point where they need to be removed from the general population.

J.C.M. was sent to another facility for a transition period. J.C.M. got in a fight on his second day at the facility. He fought with someone he knew prior to TJJD. Bennett testified that J.C.M. had not had any assaultive behavior incidents since October 22, 2022.

As to treatment programs, Bennett testified that in January 2023, J.C.M. started alcohol and drug treatment and aggression replacement training, and he was making progress in those programs. J.C.M. also started TJJD's Capital and Serious Violent Offender Treatment Program ("COG") in November 2022. J.C.M. was enrolled in school and would receive his diploma upon completing one additional course. He was working on his welding certificate and had a job in the cafeteria. He also participated in the track team.

Bennett testified about J.C.M.'s psychological evaluation completed in 2022. The results of the evaluation included concerns that J.C.M.'s violent outbursts and historical factors contributed to his ongoing violent choices. Some of the risk factors noted included J.C.M.'s poor compliance with community at juvenile detention, a poor prognosis for treatment amenability at TJJD and on parole, limited motivation, and that J.C.M. had suggested a survivalist and callous point of view.

She testified that TJJD recommended J.C.M.'s transfer to TDCJ considering his limited progress, the gravity of his underlying offense, and the lack of time to

safely determine whether J.C.M. would succeed in the community. Bennett acknowledged that the TJJD decision was made in October 2022, and since then, J.C.M. had the opportunity to participate in treatment programs. She acknowledged that between October 2022 and the February 2023 hearing, J.C.M.'s behavior had changed, and if allowed to stay at TJJD, J.C.M. could complete more rehabilitative programming.

Dr. Nichole Kuck, a psychologist at TJJD, testified on behalf of J.C.M. that she began working with J.C.M. in November 2022 as part of the COG program. She stated that the COG program is the most intensive treatment program offered at TJJD. It is reserved for those that commit the most serious offenses. The program is designed to reduce risk factors associated with violent offending. She noted that J.C.M. had not started any specialized treatment at TJJD at the time TJJD sought his early transfer to TDCJ. By the time of the transfer hearing, J.C.M. had completed half of the COG program. According to Dr. Kuck, J.C.M. was a positive influence on peers in the program and demonstrated maturity and amenability to treatment.

Dr. Lauren Washington, a mental health specialist and J.C.M.'s assigned dorm clinician, testified that J.C.M. would benefit from continuing his treatment program at TJJD. Dr. Washington added that J.C.M.'s mother died days before the transfer hearing, and in her opinion, J.C.M. would benefit from ongoing therapy.

She testified that although J.C.M. initially was not receptive to treatment, he now was amenable to individual therapy.

At the conclusion of the hearing, J.C.M.'s counsel argued that early transfer was premature because at the time he engaged in assaultive behavior at TJJD, J.C.M. had not participated in any treatment programs, and since admitted to the programs, J.C.M. showed behavioral progress. The court denied TJJD's request for early transfer, acknowledged the progress J.C.M. had made, and postponed a final determination until July, shortly before J.C.M.'s 19th birthday.

## B. Second Transfer Hearing July 10, 2023

The juvenile court held a second transfer or release hearing on July 10, 2023. J.C.M. was nearing his 19th birthday, at which point the juvenile court, at TJJD's request, must determine whether a juvenile should be released on parole supervision or transferred to TDCJ-ID to serve the remainder of his sentence. *See* TEX. FAM. CODE § 54.11; TEX. HUM. RES. CODE §§ 244.014, 245.051.

At the hearing, Bennett, a TJJD court liaison, recounted J.C.M.'s behavioral difficulties and documented incidents of rule violations during his time at TJJD. Most recently, and since the last transfer hearing, he had assaulted another youth causing bodily injury.

Bennett testified that as far as parole or transfer to TDCJ-ID, the TJJD recommends transferring J.C.M. to TDCJ-ID. She explained that TJJD believed

J.C.M. had a "superficial rehabilitation." Despite completing treatments, he engaged in additional assaultive behavior. TJJD remained concerned for the safety of the community if J.C.M. was paroled, given the original nature of J.C.M.'s underlying offense. Bennett recalled that J.C.M.'s underlying offense involved a drug transaction for marijuana and that J.C.M. shot the victim, then left with the victim's money and marijuana.

On cross-examination, Bennett testified that, since the last hearing in February, J.C.M. completed the COG program, drug treatment, aggression replacement training, and the "New Freedom Group," which is a gang intervention program. J.C.M. earned a vocational welding certificate and his high school diploma. The court admitted into evidence an updated report and documentation from TJJD.

Dr. Kuck, TJJD psychologist, testified that she leads the COG program and had worked with J.C.M. since November 2022. Dr. Kuck explained that since the last transfer hearing, J.C.M. completed the offender history portion of the COG program where he spent several days talking about all the crimes he had committed, whether noticed or not, and recognized the harm he had caused and its impact on victims. As part of this, he wrote letters to everyone he hurt. Dr. Kuck explained that the letters remain unsent but are part of the process of J.C.M. understanding the harm his actions caused.

Dr. Kuck described J.C.M. as a supportive leader with a positive presence in the COG group. Dr. Kuck testified that J.C.M. is open in therapy and would benefit from continued individual therapy. Dr. Kuck testified that after the May 28, 2023 fight, she met with J.C.M. in the regulation safety unit and helped him with repair counseling following the incident. According to Dr. Kuck, right before the fight, J.C.M. had been advised that the psychologist who evaluated him recommended his transfer to prison rather than parole. Dr Kuck testified that J.C.M. was self-sabotaging in that moment, and that afterward, he was upset that he could have jeopardized his future.

Ron'neshia Spears, a TJJD case manager, testified that she meets with J.C.M. weekly. She described J.C.M. as a "very good kid" who when motivated and focused is a positive leader. She testified that J.C.M. suffered hardship when his mother died earlier in the year, yet he completed several programs and obtained his high school diploma.

Leroy Ross testified that he is a correctional officer with TJJD who has known J.C.M. for two years. He testified that he made a concerted effort to get to know J.C.M. Ross testified that during the time he's known J.C.M., J.C.M.'s demeanor changed, as J.C.M. has calmed down. J.C.M. now participates in and leads groups in the dorm.

Russell Hall, director of the youth home and services program for Houston Revision program testified that the program could help J.C.M. if he was paroled. The program would provide J.C.M. with transitional housing, medical care, mental health counseling, and job placement.

After closing arguments, the trial court entered an order transferring J.C.M. to the TDCJ-ID to serve out the rest of his determinate sentence.

## DISCUSSION

J.C.M. appeals from the trial court's transfer order. He argues that the trial court abused its discretion by transferring him because he had shown progress toward rehabilitation, including taking advantage of programs and services offered by TJJD, and because the record reflected that he would have outside support if paroled.

### Standard of Review

We review a trial court's decision to transfer a juvenile from TJJD to TDCJ-ID for an abuse of discretion. *In re R.G.*, 994 S.W.2d 309, 312 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). In general, in this context, if some evidence supports the decision, there is no abuse of discretion. *Id.*; *accord In re C.D.T.*, 98 S.W.3d 280, 283 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

## Applicable Law

A transfer or release hearing is not a trial; rather it is a "second chance hearing" that occurs after the juvenile court has sentenced a juvenile to a determinate term of commitment. *In re D.L.*, 198 S.W.3d 228, 230 (Tex. App.—San Antonio 2006, pet. denied). The Family Code provides the guiding principles that govern the proceeding. In determining whether the juvenile should be released on parole supervision or transferred to TDCJ for completion of his sentence, the juvenile court may consider several factors, including: (1) the experiences and character of the juvenile before and after his commitment to TJJD; (2) the nature of the offense for which the juvenile was adjudicated and the manner in which the offense was committed; (3) the abilities of the juvenile to contribute to society; (4) the protection afforded the victim or any member of the victim's family; (5) the recommendations of TJJD, the county juvenile board, the local juvenile probation department, and the prosecuting attorney; (6) the best interest of the juvenile; and (7) any other relevant factors. TEX. FAM. CODE § 54.11(k). The trial court need not consider all these factors, and it may assign different weights to the factors it does consider. *In re R.G.*, 994 S.W.2d at 312. The court may consider written reports and documents from a variety of sources, including employees of TJJD. TEX. FAM. CODE § 54.11(d).

## Analysis

The question before us is whether some evidence supports the trial court's decision to transfer J.C.M. to TDCJ-ID. If some evidence supports its decision, then the trial court did not abuse its discretion.

Some evidence supports the trial court's decision. J.C.M. was adjudicated in December 2021 after confessing to committing capital murder in December 2020. When J.C.M. committed the offense at age seventeen, he used a firearm. The offense involved J.C.M. shooting the complainant and taking cash and marijuana from him. Neither side disputes the seriousness of the criminal offense for which J.C.M. was adjudicated. At the time of the second transfer hearing, J.C.M. had completed about 27 months of his 25-year sentence. The seriousness of the offense and brevity of J.C.M.'s commitment is some evidence supporting the trial court's transfer decision. *See In re L.G.G.*, 398 S.W.3d 852, 862 (Tex. App.—Corpus Christi-Edinburg 2012, no pet.) (noting juvenile court could, within its discretion, recognize that juvenile had served less than five years for a serious, violent offense and that "goals of punishment, accountability, and the protection of the community would be better served" by transfer); *In re J.J.*, 276 S.W.3d 171, 180 (Tex. App.—Austin 2008, pet. denied) (holding juvenile court did not abuse discretion given, inter alia, evidence that juvenile had been adjudicated delinquent for violent crimes involving deadly weapons).

The record included evidence that after his commitment, J.C.M. had several behavioral violations at TJJD. According to TJJD, J.C.M. had 23 documented incidents, nine of which resulted in due process hearings where the violations were proven true. Two months before the second transfer hearing, he engaged in violent behavior, assaulting and causing bodily injury to another youth.

The record showed that J.C.M.'s behavior had improved once he participated in TJJD programming and that he completed the rehabilitation programs offered to him. During his TJJD commitment, J.C.M. earned his high school diploma, worked in the cafeteria, participated in track, and earned a welding certification. Despite this evidence, the trial court, as factfinder, could have placed more weight on the evidence of J.C.M.'s delinquency and concerning conduct in custody. *See In re A.E.B.*, No. 01-19-00517-CV, 2021 WL 2931438, at *12 (Tex. App.—Houston [1st Dist.] July 13, 2021, pet. denied) (mem. op.) (observing trial court was entitled to give greater weight to significant history of delinquency and delinquent conduct that led to juvenile commitment than successful completion of program for serious violent offenders while in custody).

J.C.M. argues that the trial court abused its discretion because he had accepted responsibility for both the underlying offense and "numerous other unadjudicated acts that he was never charged with." J.C.M. further argues that his

behavior showed recent improvement, and there was at least one program that would offer him assistance on parole.

J.C.M. does not truly contest that some evidence supports the trial court's decision, but he argues that the evidence supporting the decision is outweighed by other evidence. This is an argument akin to factual sufficiency, and we have rejected the notion that transfer decisions are reviewed for factual sufficiency. *See D.G.W. v. State*, No. 01-22-00697-CV, 2024 WL 86501, at \*4 (Tex. App.— Houston [1st Dist.] Jan. 9, 2024, pet. denied) (mem. op.) (discussing incompatibility of juvenile's factual sufficiency argument with applicable standard of review); *see also R.G.*, 994 S.W.2d at 312 (noting that we may not reverse merely because we disagree with transfer decision, as long as decision is within trial court's "discretionary authority").

After reviewing the record, we hold the trial court did not abuse its discretion. *See R.G.*, 994 S.W.2d at 312–31 (holding trial court did not abuse discretion in transferring juvenile to TDCJ-ID despite evidence that juvenile obtained G.E.D., successfully completed programs at facility, and improved in behavior over time).

## Conclusion

We affirm the trial court's order transferring J.C.M. to the Institutional Division of the Texas Department of Criminal Justice.


Susanna Dokupil
Justice

Panel consists of Justices Guerra, Gunn, and Dokupil.